Judge Buchwald

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

09 CRIM 1044

- - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA    :

    - v. -        :

                    :

STANKO GRMOVSEK,        :

       Defendant.   :

- - - - - - - - - - - - - - - - - - - - - - - - x

INFORMATION

09 Cr.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: OCT 2 7 2009

COUNT ONE

(Conspiracy to Commit Fraud in Connection
with the Purchase and Sale of Securities)

The United States Attorney charges:

Introduction

1.   At all times relevant to this Information, STANKO GRMOVSEK, the defendant, lived in Ontario, Canada.  GRMOVSEK was a close personal friend and law school classmate of a coconspirator not named as a defendant herein ("CC-1").

2.   At all times relevant to this Information, CC-1 was a resident of Toronto, Canada and was a partner in the Toronto office of Dorsey & Whitney ("Dorsey"), a Minneapolis-based law firm with offices throughout the United States and the world.  In or about May 8, 2008, Dorsey terminated CC-1's partnership.  CC-1 previously worked as an associate in the New York office of a prominent New York law firm from in or about March 1996 until in or about June 1998, and was licensed to practice as an attorney in New York and Ontario, Canada.

3.   Dorsey was, among other things, engaged in representing companies in the United States and abroad, including

companies engaged in or contemplating mergers, acquisitions and other business combinations.

4.    At all times relevant to this Information, CC-1 assisted in developing Dorsey's corporate finance practice, including representing Canadian and United States-based public companies in connection with corporate finance work and capital raises.

### CC-1's Access To Inside Information

5.    In connection with its activities as a law firm, Dorsey received from various of its clients material, non-public information ("Inside Information") concerning, among other things, the clients' actual or contemplated mergers, acquisitions, and other business combinations.

6.    As a law firm partner at Dorsey's Toronto office, CC-1 was responsible for helping to represent and advise clients about, among other things, mergers, acquisitions and other business combinations as well as corporate finance requirements.  In that capacity, CC-1 frequently had access to Inside Information belonging to Dorsey's clients.  In addition, in carrying out his responsibilities, CC-1 worked closely with other Dorsey lawyers who were, like CC-1, in frequent contact with Dorsey's clients.  From time to time, CC-1's fellow lawyers informed him of developments that might affect the stock price of certain Dorsey clients, including Dorsey clients for whom CC-1 directly worked.  Those

developments included Inside Information belonging to Dorsey and its clients.

Dorsey's Policies Concerning
<u>Confidentiality and Insider Trading</u>

7.    CC-1 owed fiduciary and other duties of trust and confidence both to Dorsey and to its clients, which required that he maintain the confidentiality of all Inside Information to which he had access as a result of his employment at Dorsey.

8.    Among other things, by no later than in or about 2005, Dorsey's written Professional Responsibility Manual (the "Manual") was provided to all Dorsey attorneys, including CC-1. The Manual stated, among other things, the following:

> <u>Definitions</u>
>
> "Covered persons" means all partners and employees of Dorsey & Whitney LLP, lawyers of counsel to the Firm, and persons having general access to the Firm's offices.
>
> "Covered securities" means all securities that are issued by clients of the Firm and that are publicly traded, other than U.S. Government and agency obligations, open-end mutual funds (including money market funds), unit investment trusts, general obligation bonds, index futures and index options.
>
> "Inside information" means material information concerning the issuer of a publicly-traded security that has not been made available to the general public.
>
> <u>Policies</u>
>
> Trading or tipping with inside information is prohibited. No covered person who possesses inside information regarding a security may (1) purchase or sell such security (whether or not a covered security), either directly or through

3

an account over which he or she has discretion
(whether or not for his or her direct or
indirect benefit), or (2) communicate inside
information to another person, other than on a
lawful need to know basis.

## The Insider Trading Scheme

9.    As described more fully below, from at least in or
about 2006 through in or about February 2008, CC-1 and STANKO
GRMOVSEK, the defendant, participated in a scheme to trade in
securities based on material, non-public information that CC-1 had
misappropriated from Dorsey and various of its clients (the "Dorsey
Inside Information").  CC-1 misappropriated Dorsey Inside
Information about:  (a) the proposed acquisition by Medrad, Inc. of
Possis Medical, Inc. ("Possis"), (b) the proposed acquisition by
Terex Corporation ("Terex") of ASV, Inc. ("ASV"), (c) the proposed
acquisition by Yamana Gold of Desert Sun Mining Corp. ("Desert
Sun"), (d) the proposed acquisition by Yamana Gold of Viceroy
Exploration, Ltd. ("Viceroy"), (e) the proposed acquisition by
Goldcorp of Glamis Gold, Ltd. ("Glamis"), (f) the proposed
acquisition by Elara Holdings, Inc. ("Elara") of Direct General
Corp. ("Direct General"), (g) the reported business combination of
Eldorado Gold Corp. ("Eldorado") and Centerra Gold Corp.
("Centerra"), (h) the reported potential acquisition by Uranium
One, Inc. ("Uranium One") of Energy Metals Corp., and (i) the
proposed acquisition by Chinalco of Peru Copper, Inc. ("Peru
Copper"), and then passed that information to GRMOVSEK.  GRMOVSEK

4

traded on the basis of the Dorsey Inside Information misappropriated by CC-1 on securities exchanges in the United States and Canada, earning for himself and for CC-1 over time a total of just over $2 million in illegal profits on the United States-based exchanges alone.

10.   More specifically, CC-1 had access to material, non-public information concerning the Possis and ASV transactions, which are more fully described below, as well as the other Dorsey transactions (together, the "Dorsey Transactions") listed below:

| DORSEY CLIENT | COUNTER PARTY | TRANSACTION | DATE OF PUBLIC ANNOUNCEMENT |
|---|---|---|---|
| Yamana Gold | Desert Sun | Yamana Gold to acquire Desert Sun | 2/22/06 |
| Yamana Gold | Yamana Gold | Yamana Gold to acquire Viceroy | 8/16/06 |
| Goldcorp | Glamis | Goldcorp to acquire Glamis | 8/31/06 |
| Direct General | Elara | Elara to acquire Direct General | 12/5/06 |
| Eldorado | Centerra | Elara and Centerra to enter into business combination | 2/16/07 |
| Uranium One | Energy Metals Corp. | Uranium One negotiating to acquire Energy Metals Corp. | 5/07 |
| Chinalco | Peru Copper | Chinalco to acquire Peru Copper | 6/11/07 |

### The Trading In Possis

11.   In or about October 2007, Dorsey was retained by
Possis in connection with a proposed acquisition by Medrad of
Possis common stock as part of a cash tender offer.   Although CC-1
was not one of the Dorsey attorneys assigned to work on the Possis
matter, CC-1 nevertheless had access to documents relating to the
matter through Dorsey's shared directory and electronic database
system, called "NetDocuments."   In or about January 2008 and
February 2008, CC-1 accessed confidential documents relating to the
Possis acquisition contained in Dorsey's NetDocuments database.   In
particular, on or about February 3, 2008, CC-1 accessed three
documents relating to the Possis transaction.   As of February 3,
2008, the information about Medrad's proposed acquisition of Possis
was inside information.   Moreover, as CC-1 well knew, a public
announcement of an acquisition by Medrad of Possis would likely
result in a significant increase in the market prices of Possis's
securities.

12.   On or about the afternoon of Sunday, February 3,
2008, CC-1 contacted STANKO GRMOVSEK, the defendant, and
communicated to him inside information about Medrad's proposed
acquisition of Possis.   CC-1 provided the inside information to
GRMOVSEK as a gift, because of their close personal relationship,
and with the understanding that GRMOVSEK would use that information

to purchase and sell securities and split the proceeds of that trading with CC-1.

13.   On or about February 4, 2008, STANKO GRMOVSEK, the defendant, began to purchase shares of Possis common stock in his account and five nominee accounts that purported to belong to friends and relatives.  On the basis of the inside information misappropriated by CC-1 from Dorsey and Possis, GRMOVSEK purchased approximately 117,602 shares of Possis common stock from on or about February 4, 2008 to on or about Friday, February 8, 2008, when the closing price of Possis stock was approximately $14.35 per share.

14.   On or about Monday, February 11, 2008, at approximately 7:31 a.m. (EST), Possis and Medrad announced that Medrad intended to acquire Possis in a cash tender offer at $19.33 per share.  After the issuance of the announcement, the closing price of Possis common stock was approximately $19.36, an increase of approximately 35 percent from the price immediately prior to the issuance of the announcement.

15.   On or about February 11, 2008, after the price of Possis stock had risen following the issuance of the Medrad and Possis announcement, STANKO GRMOVSEK, the defendant, sold all of the Possis shares that he had purchased from on or about February 4, 2008 through on or about February 8, 2008.  As a result of his

purchases and sales of Possis common stock, GRMOVSEK reaped approximately $612,000 in illegal profits.

<u>The Trading In ASV</u>

16.   In or about the summer of 2007, Dorsey was retained by ASV specifically in connection with a possible acquisition or other business combination with various companies, including Terex. In or about the fall of 2007, Dorsey began to work more specifically on a possible acquisition by Terex of ASV as part of a proposed cash tender offer.  On or about November 16, 2007, Terex and ASV signed a confidentiality agreement relating to the proposed transaction.  Although CC-1 was not one of the Dorsey attorneys assigned to work on the ASV matter, CC-1 nevertheless had access to documents relating to the matter through Dorsey's NetDocuments. Notwithstanding the fact that he had no need to access the documents, from in or about December 2007 through at least on or about January 10, 2008, CC-1 accessed confidential documents relating to the ASV acquisition contained in Dorsey's NetDocuments database.  In particular, throughout the day on or about December 22, 2007, CC-1 accessed documents relating to the ASV transaction. In the morning of on or about December 24, 2007, CC-1 again accessed documents relating to the ASV transaction.

17.   As of December 24, 2007, the information about Terex's proposed acquisition of ASV was inside information. Moreover, as CC-1 well knew, a public announcement of an

acquisition by Terex of ASV would likely result in a significant increase in the market prices of ASV's securities.

18.  On or about December 24, 2007, CC-1 contacted STANKO GRMOVSEK, the defendant, and communicated to him inside information about Terex's proposed acquisition of ASV.  CC-1 provided the inside information to GRMOVSEK as a gift, because of their close personal relationship, and with the understanding that GRMOVSEK would use that information to purchase and sell securities and split the proceeds of that trading with CC-1.

19.  Starting on or about December 24, 2007 through on or about January 19, 2008, STANKO GRMOVSEK, the defendant, began to purchase shares of ASV common stock as well as ASV call option contracts in his account and other nominee accounts that purported to belong to friends and relatives.  On the basis of the inside information misappropriated by CC-1 from Dorsey and ASV, GRMOVSEK purchased approximately 226,013 shares of ASV common stock through January 10, 2008, when the closing price of ASV stock was approximately $12.73 per share.

20.  On or about Monday, January 14, 2008, at approximately 7:30 a.m. (EST), Terex and ASV announced that Terex had agreed to acquire ASV in a cash tender offer at approximately $18 per share.  After the issuance of the announcement, the closing price of ASV common stock was approximately $17.79, an increase of

approximately 45 percent from the closing price immediately prior
to the issuance of the announcement.

21.   On or about January 14, 2008, after the price of ASV
stock had risen following the issuance of the Terex and ASV
announcement, STANKO GRMOVSEK, the defendant, sold all of the ASV
securities that he had purchased from on or about December 24, 2007
through on or about January 10, 2008.  As a result of his purchases
and sales of ASV securities, GRMOVSEK reaped approximately $934,000
in illegal profits.

22.   From in or about 2006 through in or about February
2008, STANKO GRMOVSEK, the defendant, and CC-1 participated in a
scheme to defraud by executing securities transactions based on
material, nonpublic information regarding forthcoming announcements
relating to the Dorsey Transactions listed in paragraph 10 above,
as well as the Possis and ASV transactions.  CC-1 regularly and
repeatedly called or talked to GRMOVSEK and provided GRMOVSEK with
Dorsey Inside Information in violation of (a) the fiduciary and
other duties of trust and confidence owed by CC-1 to Dorsey and its
clients, (b) the expectations of confidentiality of the Dorsey
clients, and (c) Dorsey's written policies regarding the use and
safekeeping of confidential and material, non-public information.

23.   To carry out the scheme, CC-1 typically called
STANKO GRMOVSEK, the defendant, in advance of a public announcement
that a particular target company listed in paragraph 10 above (or

Possis or ASV) was to be acquired by another entity, and CC-1 provided Dorsey Inside Information to GRMOVSEK regarding the acquisition in question (hereafter, the target companies listed in paragraph 10 above, as well as Possis and ASV, are referred to as the "Issuers"). As with the Possis and ASV transactions, shortly after obtaining such information GRMOVSEK purchased securities of that Issuer based on the Dorsey Inside Information he received from CC-1. Following public disclosure that an Issuer was being acquired - which occurred after GRMOVSEK had already purchased securities in that particular Issuer - GRMOVSEK quickly sold all of the securities he had purchased in advance of the public disclosures. GRMOVSEK executed dozens of securities transactions on United States-based securities exchanges as well as Canadian securities exchanges, including the New York Stock Exchange (the "NYSE"), based on Dorsey Inside Information. GRMOVSEK profited from his trading in the securities of each of the Issuers, which generated total profits on the United States-based exchanges in excess of $2 million. At or around the end of the scheme, CC-1 and GRMOVSEK split the proceeds of the illegal securities transactions involving the Issuers.

<u>The Conspiracy</u>

24.   From at least in or about 2006 up to and including in or about February 2008, in the Southern District of New York and elsewhere, STANKO GRMOVSEK, the defendant, CC-1 and others known

11

and unknown, unlawfully, willfully, and knowingly did combine,
conspire, confederate and agree together and with each other to
commit offenses against the United States, to wit, securities
fraud, in violation of Title 15, United States Code, Sections
78j(b) & 78ff, and Title 17, Code of Federal Regulations, Sections
240.10b-5 and 240.10b5-2.

<u>Object of the Conspiracy</u>

<u>Securities Fraud</u>

25.  It was a part and object of the conspiracy that
STANKO GRMOVSEK, the defendant, CC-1 and others known and unknown,
unlawfully, willfully and knowingly, directly and indirectly, by
the use of means and instrumentalities of interstate commerce, and
of the mails, and of facilities of national securities exchanges,
would and did use and employ, in connection with the purchase and
sale of securities, manipulative and deceptive devices and
contrivances in violation of Title 17, Code  of Federal
Regulations, Section 240.10b-5 by: (a) employing

devices, schemes and artifices to defraud; (b) making untrue
statements of material fact and omitting to state material facts
necessary in order to make the statements made, in the light of
the circumstances under which they were made, not misleading; and
(c) engaging in acts, practices and courses of business which

operated and would operate as a fraud and deceit upon other persons, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5.

<u>Means and Methods of the Conspiracy</u>

26.   Among the means and methods by which STANKO GRMOVSEK, the defendant, CC-1 and others known and unknown, would and did carry out the conspiracy were the following:

a.   CC-1 misappropriated the Dorsey Inside Information in violation of (a) the fiduciary and other duties of trust and confidence that CC-1 owed to Dorsey and Dorsey clients; (b) the expectations of confidentiality of the Dorsey clients; and (c) Dorsey's written policies regarding the use and safekeeping of confidential and material, nonpublic information.

b.   CC-1, in breach of his duty of confidentiality to Dorsey and its clients, disclosed the Dorsey Inside Information that he had misappropriated from Dorsey and the Dorsey clients to GRMOVSEK, with the understanding that GRMOVSEK would use the Dorsey Inside Information to purchase and sell securities, and thereby receive substantial illegal profits.

c.   GRMOVSEK, while in possession of the Dorsey Inside Information that he knew had been misappropriated by CC-1 in breach of CC-1's duty to keep such information confidential,

purchased and sold securities based on such information and thereby received substantial illegal profits.

Overt Acts

27.   In furtherance of the conspiracy and to effect the unlawful object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.   On or about February 9, 2006, in a transaction conducted on the American Stock Exchange in New York, New York, STANKO GRMOVSEK, the defendant, purchased approximately 10,000 shares of Desert Sun common stock.

b.   On or about August 24, 2006, in a transaction conducted on the NYSE in New York, New York, GRMOVSEK purchased approximately 5,000 shares of Glamis common stock.

c.   On or about February 3, 2008, CC-1 spoke by telephone with GRMOVSEK.

(Title 18, United States Code, Section 371.)

PREET BHARARA
United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

## UNITED STATES OF AMERICA

- v -

## STANKO GRMOVSEK,

**Defendant.**

## INFORMATION

93 Cr.

(Title 18, United States Code, § 371.)

PREET BHARARA
United States Attorney.